(No. 46952.—)

JEFFERSON ELECTRIC COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*—(Anna Mary Czaja, Appellee.)

*Opinion filed May 28, 1976.—Rehearing denied Sept. 30, 1976.*

87

GOLDENHERSH, J., dissenting.

Burgeson, Laughlin, Cunningham & Smith, of Chicago (Forrest D. Serblin, of counsel), for appellant.

Weisberg, Livinieks, Lebolt and Newman, and Ganan, Boton and Shapiro, both of Chicago (Jay M. Shapiro, of counsel), for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The claimant, Anna Mary Czaja, filed an application for compensation under the Workmen's Compensation Act (Ill. Rev. Stat. 1967, ch. 48, par. 138.1 *et seq.*) for an injury suffered on September 11, 1967, while she was employed by the respondent, Jefferson Electric Company. The arbitrator determined that the injury to the claimant had caused complete disability, and pursuant to paragraph

(f) of section 8 of the Act (Ill. Rev. Stat. 1967, ch. 48, par. 138.8(f)) awarded her the sum of $58 per week for a period of 258 weeks beginning December 13, 1967, and thereafter a pension of $1,800 for life, payable in equal monthly installments of $150 each. The claimant was also awarded some $4,600 for medical and hospital services under paragraph (a) of section 8. (Ill. Rev. Stat. 1967, ch. 48, par. 138.8(a).) The Commission heard evidence on review and confirmed the decision of the arbitrator. On *certiorari* the circuit court of Cook County confirmed the order of the Commission, and the respondent has appealed pursuant to Rule 302(a).

The award for medical and hospital services is not challehged here, and it is not contested that there was an injury which arose out of and in the course of employment. The respondent challenges the award of the pension made under section 8(f), however, on the ground that there was no proof of complete disability, which is defined by that section as a disability which "renders the employee wholly and permanently incapable of work."

The claimant's job with respondent was that of a supervisor in the coil finishing department. While the claimant testified that on occasion she would carry a box of coils, her principal duties were instructional and supervisory. She had been with the company for 34 years, and at the time of her accident she was 49 years old.

The accident occurred when the claimant, intending to sit down on a chair, miscalculated its location and fell down, hitting her posterior on the concrete floor. The sudden fall caused immediate pain, both in that part of her body which struck the floor and in her spine. Subsequent examination of the claimant disclosed that her fall had caused no fracture or dislocation.

The claimant continued her work with respondent following the accident until December 13, 1967. On that day and the two days following, because of the pain in her

back, she did not report for work. On December 15, the respondent was acquired by Litton Industries. As the result of the reorganization the employment of the claimant and certain other employees was terminated. No contention is made that she was discharged because of her accident.

Following her discharge, claimant testified, she continued to experience pain in her back. She consulted several physicians, both before and after her discharge, and on March 16, 1968, she entered a hospital for various tests and therapy. She was discharged on April 7, but continued to visit the hospital on an out-patient basis until September 6. From time to time, at the direction of her doctors, she has taken medication to relieve the pain. She also wears a lumbrosacral belt, and employs heating pads and a whirlpool bath for that same purpose.

At the hearing before the Commission, the respondent called as a witness a doctor who had made a physical examination of the claimant at the respondent's request. His testimony was that he found no physical injury, and in answer to a hypothetical question he expressed the opinion that the claimant could now perform the same work which she had been doing prior to the accident. The claimant did not call any of the doctors who treated her, or any other physician, to testify as to the physical aspects of her injury.

The claimant testified that following her discharge she was forced to give up certain household tasks, such as scrubbing floors, washing windows, and mowing the lawn, which required her to assume bodily positions that would produce pain in her back. But she does not predicate her claim of disability upon her pain or upon these limitations of her physical activities. The asserted basis of her claim is rather that the curtailment of her activities, and the concomitant dependence upon other people to perform or to help her with household tasks which she had formerly

been able to perform by herself, drove her into a state of serious depression which, in turn, made the idea of resuming employment emotionally unacceptable.

The establishment of a causal chain extending from her fall through the restriction of her physical activities, her state of depression, and ending with an inability to return to work, rests on the testimony of a psychiatrist, Dr. James S. Rejtman, who interviewed the claimant twice, in 1971, at the request of her attorney, in preparation for the hearing on her claim. His testimony was based entirely on his observations of the claimant's demeanor during two interviews, each of one hour's duration, and on her narration to him of her personal history and present condition.

On the basis of what the claimant told him of her past life, he characterized her as having an "obsessive compulsive personality disorder" prior to her accident. He went on to testify that because of that disorder, the impairment of her motor functioning since the accident as she related it to him, had resulted in a "chronic reactive depression." In answer to a hypothetical question, the witness stated that there was a causal connection between her fall and her present psychological condition.

Dr. Rejtman's testimony acknowledged that the loss of the claimant's job was also an important factor, and that it was, indeed, "the major blow." He testified further that if she had been able to remain at her job, her emotional damage would not have been so great, and the chance for her emotional rehabilitation would have been improved. In discussing the meaning of a reactive depression, Dr. Rejtman stated: "For instance, a loss is a most typical cause of depressive reaction. A loss of a friend, a loss of a spouse, relative, a loss of financial means. *** If that job has been something they have invested [in] very heavily, as appeared in this woman, over 34 years, [it] certainly has been enough to provoke this."

Considering Dr. Rejtman's testimony as a whole, and

in light of the fact that the claimant's testimony was that she began to experience her chronic depression only after her job was terminated, we entertain some doubt whether it was not the termination of her job, which would not, of course, be compensable, that accounted for her depressive reaction. But since a work-connected accident need not be the sole, or even the dominant factor causing disability, Dr. Rejtman's affirmative answer to the hypothetical question put to him gave the Commission competence to attribute the claimant's mental condition to her accident. *Leason v. Industrial Com.* (1973), 55 Ill. 486, 493; *Republic Steel Corp. v. Industrial Com.* (1962), 26 Ill.2d 32, 45.

The respondent contends that Dr. Rejtman's entire testimony as to episodes told to him by the claimant should also have been excluded as hearsay, since he was not then engaged in treating the claimant. We find it unnecessary to consider that question, since we conclude that Dr. Rejtman's testimony in any event failed to establish that the claimant was rendered "wholly and permanently incapable of work," as the Act requires.

It is admitted that the claimant has not become re-employed since her employment with the respondent was terminated. There is no evidence of any attempt by the claimant to seek employment of any kind. In December, 1967, she applied for unemployment compensation, which she received until she entered the hospital in March of 1968. At that time she withdrew her application for unemployment compensation, and following her discharge from the hospital she did not re-apply. The claimant did not herself testify that her mental condition prevented her from working. Any such inference must rest entirely on the testimony of Dr. Rejtman.

Dr. Rejtman was asked on direct examination whether he believed, on the basis of his interviews with the claimant, that she could return to any type of work. His answer was that it was very unlikely she would ever return

to work. His testimony made it clear that this answer was not based on any assumptions concerning the claimant's physical condition, of which he had no first-hand knowledge. He also testified that the claimant was not suffering from any impairment of memory, orientation, or any other intellectual function. The basis of his opinion, he explained, was that the claimant had developed an "unconscious block" against resuming employment, in that her dependence on other persons to perform tasks which formerly she had been able to do by herself had created a "secondary gain" in being cared for, a gratification which would be removed should she return to work.

The claimant was also interviewed by another psychiatrist, Dr. H. H. Garner, at the request of the respondent. Dr. Garner was not called as a witness, but claimant, over objection, introduced his report to the respondent. In his report Dr. Garner also expressed the opinion that the claimant's personality was of the compulsive obsessive type, and that she was experiencing a sense of helplessness and depression. He added that in his view she was also feeling anxiety because she had an image of herself as an invalid who would be automatically disqualified from future employment.

Dr. Rejtman stated that the claimant was not consciously simulating symptoms, and there was no evidence to the contrary. We are nevertheless of the opinion that the sense in which the claimant can be regarded as unable to resume employment is not the kind of inability contemplated by section 8(f).

Under our decisions, an employee is totally and permanently disabled only if "he is unable to make some contribution to industry sufficient to justify payment to him of wages" (*Ford Motor Co. v. Industrial Com.* (1934), 355 Ill. 490, 494; *Cebulski v. Industrial Com.* (1971), 48 Ill.2d 289, 293.) If an employee can take up some form of employment without seriously endangering his health or

life, the fact that he does not do so does not qualify him for compensation. *Perry Coal Co. v. Industrial Com.* (1931), 343 Ill. 525, 529; *Crerar Clinch Coal Co. v. Industrial Com.* (1954), 3 Ill.2d 88, 91-92.

Our decisions have recognized that disability may be of a psychological as well as a physical nature. (See *Thomas J. Douglass & Co. v. Industrial Com.* (1966), 35 Ill.2d 100; *International Harvester Co. v. Industrial Com.* (1970), 46 Ill.2d 238; *South Import Motors, Inc. v. Industrial Com.* (1972), 52 Ill.2d 485; *Hook v. Industrial Com.* (1972), 53 Ill.2d 245; *City of Chicago v. Industrial Com.* (1974), 59 Ill.2d 284.) But in the case of a psychological disorder, as with one of a physical character, it remains necessary to establish by competent evidence that the disorder renders the employee incapable of work, in that it will interfere with the performance of his duties or will be incompatible with the conditions of his employment. Thus, for example, in *Thomas J. Douglass & Co. v. Industrial Com.* (1966), 35 Ill.2d 100, *International Harvester Co. v. Industrial Com.* (1970), 46 Ill.2d 238, and *South Import Motors, Inc. v. Industrial Com.* (1972), 52 Ill.2d 485, the employee suffered a severe sensory or memory loss. In *Hook v. Industrial Com.* (1972), 53 Ill.2d 245, a traumatic neurosis led to a disabling restriction of bodily movements. In *City of Chicago v. Industrial Com.* (1974), 59 Ill.2d 284, the claimant experienced a "phantom pain" which, although having no organic or neurological explanation, occurred whenever the employee engaged in physical activity.

The claimant here does not rest her claim to compensation on the proposition that her psychological condition will be worsened by or is incompatible with a resumption of employment. On the contrary, her psychiatric witness testified that a return to work would have a beneficial effect. And, as we have previously pointed out, the claimant does not maintain, and the evidence does not

show, that the pain which she allegedly experiences while engaging in certain physical activities at home bars her from any form of gainful employment.

The provisions of the Workmen's Compensation Act relating to complete disability are designed to compensate employees who, because of a job-related injury, are willing but unable to obtain employment. To extend it to an employee who claims to be psychologically unable even to seek employment would produce the anomalous result of preventing an employer from eliminating or reducing his liability by offering to rehire the employee. At the same time the employee would be placed in a position where he could obtain under the Workmen's Compensation Act what would amount to unemployment compensation in a situation where it is at least dubious whether the claim could be allowed under the Illinois Unemployment Compensation Act. The latter act is also designed to provide benefits for those who are willing and anxious to work. (Ill. Rev. Stat. 1967, ch. 48, par. 420; *cf. Wadlington v. Mindes* (1970), 45 Ill.2d 447, 453-54, *appeal dismissed,* 400 U.S. 935, 27 L. Ed. 2d 242, 91 S. Ct. 252.) We noted in *Wadlington,* 45 Ill.2d 447, 455-56, that the State has a valid interest in maintaining the integrity of a statutory scheme of unemployment compensation, which is financed by the employer. Similar considerations are germane to the Workmen's Compensation Act, and compel us to hold that the award of a pension to the claimant cannot stand.

The judgment of the circuit court is accordingly reversed, and the cause is remanded to the Industrial Commission with directions to set aside that part of the award made under section 8(f) of the Act.

*Reversed and remanded, with directions.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. The majority's conclusion that to be compensatory a condition of neurosis must result in some demonstrable physical disability finds no support in either

the statutes or the cases. This record shows a condition from which the Industrial Commission could and did find that petitioner was totally disabled.

The majority states that:

> "The claimant here does not rest her claim to compensation on the proposition that her psychological condition will be worsened by or is incompatible with a resumption of employment. On the contrary, her psychiatric witness testified that a return to work would have a beneficial effect. And, as we have previously pointed out, the claimant does not maintain, and the evidence does not show, that the pain which she allegedly experiences while engaging in certain physical activities at home bars her from any form of gainful employment." (64 Ill. 2d at 93-94.)

This statement completely misconstrues the medical testimony and implies that petitioner has voluntarily chosen to remain unemployed. On the contrary, the record shows that in the opinion of Dr. Rejtman, the neurosis from which petitioner suffered rendered her totally incapable of seeking employment and was as effectively disabling as any physical condition might be. Furthermore, Dr. Rejtman's opinion is corroborated by that of Dr. H. H. Garner, who examined petitioner for the respondent. Dr. Garner's report states:

> "In my opinion Mrs. Anna Czaja is a person whose personality pattern was characteristically that of an obsessive compulsive person. Following an injury at work there was a breakdown in the effectiveness of the coping mechanisms for meeting work, social and sexual expectations. She is now displaying the symptoms of a psychoneurotic disturbance with depression and psychophysiological reactions as outstanding. The patient's expectations of being hopelessly unemployable acts to create anxiety over the anticipation of recovery and the return to gainful employment. Treatment by psychotherapy to alter her self-image of a helpless invalid no longer

employable might be successful in the hands of a skillful therapist."

The majority, in *dictum,* states:

"The provisions of the Workmen's Compensation Act relating to complete disability are designed to compensate employees who, because of a job-related injury, are willing but unable to obtain employment. To extend it to an employee who claims to be psychologically unable even to seek employment would produce the anomalous result of preventing an employer from eliminating or reducing his liability by offering to rehire the employee. At the same time the employee would be placed in a position where he could obtain under the Workmen's Compensation Act what would amount to unemployment compensation in a situation where it is at least dubious whether the claim could be allowed under the Illinois Unemployment Compensation Act. The latter act is also designed to provide benefits for those who are willing and anxious to work." (64 Ill. 2d at 94.)

The dubiety of a claim under the Illinois Unemployment Compensation Act is, of course, wholly irrelevant to this case. There is no doubt, however, that the medical evidence, which showed that as the result of her accidental injury petitioner was "psychologically unable even to seek employment," supports the finding of the Industrial Commission that she was permanently and totally disabled.

The majority wholly disregards the long-established rule that the Industrial Commission is the factfinding body and that its decision should not be disturbed unless it is against the manifest weight of the evidence. This unprecedented decision, based on a misinterpretation of the medical testimony, does violence to that rule.